FILED

June 23 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0725

DA 14-0725

## IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 174N

IN RE THE MARRIAGE OF:

DARCY A. LABEAU,

        Petitioner and Appellant,

    and

BENJAMIN LABEAU,

        Respondent and Appellee.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DR 13-638
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Kenneth D. Tolliver, Joshua P. Oie, Tolliver Law Firm, PC, Billings, Montana

        For Appellee:

            Casey J. Heitz, Parker, Heitz & Cosgrove, PLLC, Billings, Montana

Submitted on Briefs:  May 20, 2015
Decided:  June 23, 2015

Filed:

                                        Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Darcy LaBeau appeals the Thirteenth Judicial District Court's final decree dissolving her marriage to Benjamin (Ben) LaBeau. Darcy and Ben married in 1998 in Billings, Montana, and separated in April 2013. Darcy petitioned for dissolution in June 2013. Darcy and Ben have three children, who were all minors during the District Court proceedings. Ben holds degrees in business finance and law, and he worked as an attorney throughout the parties' marriage. In 2000, Ben started a solo practice, LaBeau Law Firm, which he continued to operate at the time of trial. Darcy holds degrees in business marketing and human resources management. During the marriage, Darcy had various part-time jobs and devoted much of her time as a homemaker and to raising the children.

¶3 On August 15, 2014, the District Court entered its Findings of Fact, Conclusions of Law, and Decree of Dissolution. Darcy appeals only the court's distribution of marital property and its decision not to award her maintenance.

¶4 Ben and Darcy agreed that Darcy should receive her interest in property inherited from her parents, which Darcy shares with her two siblings. After awarding Darcy that

2

property, the District Court divided the parties' remaining net worth, which the court valued at $404,496. The court allocated $88,687 (21.9%) to Darcy and $315,809 (78.1%) to Ben. With Darcy's inherited property included in the calculation, Darcy received a net value of $4,035,354 (92.7%) and Ben received a net value of $315,809 (7.3%) of the marital estate.[1] The court further concluded, "Given the amount and value of assets apportioned to Darcy, resulting in a net worth to her of over $4,000,000, she is not entitled to further maintenance."

¶5      Darcy argues that the District Court's decision not to award her spousal maintenance was based on erroneous findings regarding the amount and sources of her income, and that the District Court erred in its findings regarding temporary maintenance, the value of Ben's law practice, and the value of each party's contributions to the marriage. Darcy further argues that the District Court abused its discretion by awarding cash that does not exist in the estate and by not allocating to Darcy the marital home or the means to procure suitable housing.

¶6      In apportioning marital property, a district court must consider each factor listed in § 40-4-202, MCA, "and there must be competent evidence presented on the values of the property." *In re Funk*, 2012 MT 14, ¶ 7, 363 Mont. 352, 270 P.3d 39 (quoting *Marriage of Collett*, 190 Mont. 500, 504, 621 P.2d 1093, 1095 (1981)). As long as a district court

---

[1] The District Court's Findings of Fact, Conclusions of Law, and Decree of Dissolution uses these numbers, which the court says are adopted from Ben's assets and liability valuation and distribution proposal. Ben's proposal appears to assert a net worth of $4,401,970.05, of which he receives $375,681.18 and Darcy receives $4,020,788.87. Ben's proposed calculations award Darcy a lower net value and Ben a higher net value than do the District Court's calculations. On appeal, Ben cites the numbers used by the District Court and does not dispute them. Accordingly, we will not disturb the District Court's valuations.

3

complies with these requirements, it has "broad discretion to apportion the marital estate in a manner equitable to each party under the circumstances." *Funk*, ¶ 6. Absent clearly erroneous findings of fact or an incorrect application of the law, "we will affirm a district court's division of marital property and award of maintenance unless we identify an abuse of discretion." *Funk*, ¶ 6.

*The District Court's findings regarding spousal maintenance*

¶7 Under § 40-4-203(1), MCA, a district court may award maintenance "only if it finds that the spouse seeking maintenance: (a) lacks sufficient property to provide for the spouse's reasonable needs; and (b) is unable to be self-supporting through appropriate employment . . . ." The District Court declined to award Darcy spousal maintenance because it determined that Darcy had the following potential sources of income: anticipated profits from property inherited from her parents; her employment at Energy Jobs Solutions; her interior design company; and $1,620 per month in child support, to which the parties stipulated. Darcy argues that deriving income from her inherited property is unlikely and beyond her control, that the District Court erred in determining the amount of her commission at Energy Jobs Solutions, and that the court erred in finding that she would generate income from interior design work.

¶8 Darcy's inheritance comprises a one-third interest in a house located on Camano Island, Washington, and a one-third interest in the Mission Ranch, Inc. Darcy's siblings, Rob Stephens, Jr. (Robbie) and Zena Dell Dowe, own the remaining two-thirds of both properties. The Mission Ranch, Inc. comprises 3,900 acres of deeded land, plus a 640-

4

acre section that the Ranch leases through the Montana Department of Natural Resources and Conservation. Each sibling also has a one-third interest in the Mission Ranch livestock, Farm Equipment LLC, and the Mission Ranch Lodge LLC. Additionally, Darcy owns a one-half interest in S&L Farm Equipment LLC. Based on evidence presented at trial, the District Court found that the Mission Ranch, Inc. and its associated properties and business entities (collectively, "the Mission Ranch") have a net value of between $10 million and $13.5 million. Darcy owned three percent of the shares in the Mission Ranch when she and Ben married, and she received an additional thirty percent during the marriage. The court valued Darcy's shares in the property at $3,946,667.

¶9 The District Court found that, though the Mission Ranch has never made a distribution of income, the siblings expected a recently-hired, experienced ranch manager to help the Mission Ranch gain profitability. The court further found that Darcy could sell her shares to produce income. Darcy contends that unanimous director approval is required for any sale, and that Darcy's siblings, who are the two other directors, are opposed to selling the Mission Ranch. However, record evidence shows that the siblings have listed various portions of the ranch for sale in recent years. For example, in 2012, Darcy, Robbie, and Zena listed the Mission Ranch for sale, excluding the Mission Ranch Lodge, a fifteen-acre tract containing historic Fort Parker, and forty acres on Mission Creek. The siblings' asking price was $14 million. In April 2014, two months before trial, Darcy agreed to remove the ranch from active listing. Also in 2014, the siblings signed an agreement to sell a fifteen-acre tract of land containing historic Fort Parker for

5

$150,000, or $10,000 per acre. Before that sale, the siblings sold forty acres of the ranch to a previous ranch manager for $150,000. The Mission Ranch Lodge also was listed for sale at least twice at $1.5 million. Robbie testified that he thinks the lodge would "sell pretty quickly" at $900,000. The District Court's finding that Darcy could sell portions of the Mission Ranch to produce income was not clearly erroneous in light of this history. The court was presented with substantial evidence to contradict Darcy's statement that her siblings were unwilling to sell.

¶10 Citing *In re Marriage of Cole*, 234 Mont. 352, 763 P.2d 39 (1988), Darcy argues that her inherited property is income-consuming, not income-producing, and therefore cannot fulfill her financial needs. At trial, however, the siblings testified to various ways in which the Mission Ranch could make money, including livestock sales, leasing out farm equipment, and renting rooms at the Mission Ranch Lodge. In addition, the District Court noted that Darcy could sell some of her shares in the Mission Ranch to her siblings and invest the proceeds to produce income.

¶11 In addition to Darcy's assets in the Mission Ranch, the District Court determined that Darcy could earn income through her corporate recruiting job at Energy Jobs Solutions. The court stated that Darcy would make more than $30,000 in 2014 and that, in the future, she could earn commissions equal to thirty-five or forty percent of the salary of any placement she makes. Darcy argues that the District Court erred because Darcy's actual commission would be between seven and ten percent of a placement's salary, and she would not make more than $30,000 per year. Even with this factual error

6

in the court's findings, the record shows that Darcy agreed to Ben's child support calculations, which stated that Darcy earned $35,000 in wages, salary, and commissions. Further, in calculating Darcy's income, the court relied on her predicted annual salary, not on her commission percentage. Accordingly, the District Court's findings regarding Darcy's expected income were not clearly erroneous.

¶12 Finally, Darcy argues that she cannot generate income from her interior design work. But Darcy stated in her answers to interrogatories that her income from her interior design company, My Montana, would range between $200 and $700 per month. Moreover, the District Court did not put a monetary value on Darcy's ability to earn income from My Montana and did not calculate future income potential from that business. The court's statement that Darcy could earn future income from My Montana did not materially affect its determination regarding maintenance.

¶13 In sum, the District Court's findings regarding the amounts and sources of Darcy's income were not clearly erroneous. The court did not abuse its discretion by declining to award Darcy spousal maintenance.

*The District Court's findings regarding temporary maintenance*

¶14 After the parties separated in April 2013, Ben moved into an apartment but continued to pay the family household expenses until Darcy became employed. At that time, he reduced his payments to $3,000 per month. The District Court found that Ben's payments to Darcy constituted temporary spousal maintenance and retroactively credited Ben with $45,315. This figure represented the total in payments Ben made to Darcy

between April 2013, and June 16, 2014, minus the parties' stipulated monthly child support. Darcy argues that the District Court erred by categorizing these payments as "temporary maintenance."

¶15 Darcy cites *In re Marriage of Rudolf*, 2007 MT 178, 338 Mont. 226, 164 P.3d 907, to support her argument that a designation of temporary maintenance may be made retroactive only to the date of a motion for a temporary family support order. In *Rudolf*, we held that a district court cannot order retroactive payment of temporary maintenance going back to three years before a petition for temporary maintenance is filed. *Rudolf*, ¶ 41. By contrast, the District Court credited Ben with the temporary support payments he voluntarily made after the parties separated. Darcy acknowledged that these payments constituted temporary maintenance in her April 11, 2014 Motion for Temporary Orders and Brief in Support, when she requested that the court require Ben "to continue paying temporary support/maintenance in the amount of $4,000.00 per month." The District Court did not err by categorizing the $45,315 Ben paid to Darcy as temporary spousal maintenance.

¶16 Darcy further argues that the court's award to Ben of the marital home means that its designation of temporary maintenance directly conflicts with Internal Revenue Service (IRS) guidelines for the treatment of maintenance awards. In its order denying Darcy's Motion to Alter or Amend Findings and Conclusions, the District Court noted, "Darcy argues that she should be entitled to temporary maintenance and that the [c]ourt's ruling cannot trump [IRS] rules or regulations. The Court received no evidence regarding IRS

regulations or rulings." A motion to alter or amend a court's judgment may not be used to raise arguments that could have been raised prior to judgment. *In re Johnson*, 2011 MT 255, ¶ 15, 362 Mont. 236, 262 P.3d 1105. Because Darcy did not raise the IRS rules prior to judgment, we will not consider that argument on appeal.

¶17 Finally, Darcy argues that the court erred by designating proceeds from the sale of a vehicle as temporary maintenance. The court did not require a specific amount of temporary maintenance, but credited Ben with voluntarily providing Darcy $45,315 in payments. The District Court's characterization of the vehicle sale proceeds as temporary maintenance was not error in the context of its ruling that Ben provided Darcy with funds to support the family during the pendency of the case and until she obtained employment and could support herself.

*The District Court's findings regarding the value of Ben's law practice*

¶18 The District Court valued Ben's law practice at $10,000. In addition, the court valued LaBeau Law Firm's savings account at $27,000 and its checking account at $1,000. Darcy argues that these findings are clearly erroneous because the court should have valued the goodwill of LaBeau Law Firm and evidence showed that LaBeau Law Firm's checking account contains $5,000.

¶19 It is a district court's job to weigh competing evidence. *See In re Marriage of Milesnick*, 235 Mont. 88, 95, 765 P.2d 751, 755 (1988) ("Unless there is a clear preponderance of the evidence against the District Court's valuation, its findings, where based on substantial though conflicting evidence, will not be disturbed on appeal."). At

trial, Ben testified that LaBeau Law Firm's checking account had "probably . . . about" $5,000. By contrast, Ben's Preliminary and Final Asset and Liability Disclosure listed the account as containing $1,000. Without contrary evidence from Darcy, and in light of the marital estate's net worth, the District Court did not commit clear error by using the written value of the account, presented in Ben's Preliminary and Final Asset and Liability Disclosure, instead of Ben's oral estimate of the account's value at trial.

¶20 Given the District Court's finding that LaBeau Law Firm has an annual net profit of $125,000, Darcy maintains that the court was *required* to consider the business's goodwill. "A district court has far reaching discretionary powers to determine the value of property in a dissolution action . . . . As long as the valuation is reasonable in light of the evidence submitted, we will not disturb that finding on appeal." *Milesnick*, 235 Mont. at 94-95, 765 P.2d at 755. In *In re Marriage of Stufft*, 286 Mont. 239, 249, 950 P.2d 1373, 1379 (1997), we held that a district court did not err by relying on expert testimony on the value of a law firm when the opposing party offered no evidence to contradict that testimony. Darcy never provided a goodwill value for the firm. When asked about LaBeau Law Firm's goodwill at trial, Darcy's attorney stated, "The value of the firm on the market for [Ben's] operation cannot adequately be related to what someone else would pay for it." In her reply brief, Darcy acknowledged that her arguments regarding LaBeau Law Firm's goodwill "could be better." By contrast, Ben testified that the total value of the firm was $10,000.

10

¶21 Further, the cases Darcy cites do not support her position that the District Court was required to value the firm's goodwill. In *Milesnick*, we determined that a district court did not abuse its discretion by considering a business's goodwill when the parties did not propose a goodwill value. *Milesnick*, 235 Mont. at 94-95, 765 P.2d at 755. We did not hold that a district court is required to value goodwill when it has not been presented with evidence of a goodwill value. Additionally, the District Court did not assign a goodwill value to any of the businesses that it attributed to Darcy: Farm Equipment LLC, S&L Farm Equipment LLC, My Montana Interior Design, and Mission Ranch Beef Company. Without any evidence of goodwill value, the District Court did not abuse its discretion by deciding not to assign such value to LaBeau Law Firm.

*The Court's valuation of the parties' contributions to the marriage*

¶22 Throughout the marriage, Ben performed uncompensated legal services to Darcy and her family for the Mission Ranch. The District Court assigned a $144,000 value to these services. The court also found that Darcy contributed to the family as a homemaker. Darcy disputes these findings, arguing that the court erroneously valued Ben's legal contributions to the Mission Ranch and did not place sufficient value on Darcy's contributions as a homemaker.

¶23 Ben did not specifically document time he spent on uncompensated legal services, but he estimated that he spent at least 1,200 hours on various projects for the Mission Ranch during the parties' marriage. The District Court found that, during the time Ben was providing legal services to the Mission Ranch, his hourly rate fluctuated between

11

$120 and $200 per hour. The court multiplied Ben's lowest hourly rate—$120 per hour—by 1,200 hours to arrive at $144,000, representing the total value of Ben's legal contributions to the Mission Ranch. The court noted that this number represented a "very conservative" estimate of the value of Ben's time.

¶24 Darcy argues that the District Court erroneously relied on Ben's estimate that he spent 1,000 hours working on a legal issue involving a claim to ownership of the Mission Ranch by Darcy's stepfather, Doug Ensign. According to Darcy, the District Court overstated the precariousness of the Mission Ranch and the impact of Ben's work because Ben "did not materially contribute" to the settlement agreement with Ensign.

¶25 While Darcy acknowledges Ben's work, she argues that the court should have relied on testimony from her father, also an attorney, that Ben spent far less than 1,000 hours on the dispute with Ensign. As we have stated, it is the role of the District Court to weigh conflicting evidence, which includes testimony. There is sufficient evidence in the record to support the court's finding that Ben contributed significantly to the dispute with Ensign. The District Court did not err by relying on Ben's estimate that he spent 1,000 hours on that issue. Darcy does not contest the remaining 200 hours of Ben's estimated time.

¶26 Darcy also argues that the court did not adequately address her contributions as a homemaker because the court provided an in-depth analysis of Ben's contributions to the Mission Ranch but addressed Darcy's contributions in just one sentence. Darcy implies that the court should have assigned a dollar value to Darcy's contributions. The District

Court stated that it considered all testimony of the parties and the factors set forth in § 40-4-202, MCA, and that "Darcy did contribute as a homemaker. Ben contributed significantly to protecting the value of the Mission Ranch. For these reasons, the Court finds that Ben's asset and liability valuation and distribution proposal is fair and equitable . . . ." The court then awarded Darcy more than ninety-two percent of the marital estate, noting that the "net worth designation to each party, while not equal, is both fair and equitable, given the parties' duration of marriage and assignment of [a] majority of [the] assets to Darcy." Though Darcy argues that the parties are left to speculate as to how the court evaluated Darcy's contributions as a homemaker, the court's findings and conclusions make clear that the court considered the length of the parties' marriage and Darcy's role as a homemaker during that time. The District Court's findings regarding Darcy's contributions to the marriage were not clearly erroneous. The court did not abuse its discretion in assigning Darcy 92.7% of the marital estate.

*The District Court's allocation of Ben's contributions to the Mission Ranch*

¶27 Darcy argues that the District Court abused its discretion because, in a spreadsheet labeled "Exhibit 1" of its findings and conclusions, the court awarded Darcy $144,000 in cash that does not exist in the estate. However, the court's allocation of this value to Darcy was merely an illustration of the court's recognition that Ben contributed $144,000 to the value of Darcy's assets in the Mission Ranch. It did not affect the distribution of the net marital estate, which was $4,035,354 to Darcy and $315,809 to Ben.

13

Accordingly, we agree with Ben that the $144,000 figure is an allocation of value, not an award in cash.

*The District Court's decision not to allocate the marital home to Darcy*

¶28 Darcy argues that the District Court abused its discretion by declining to award her the marital home or to provide the means to procure housing. Darcy's arguments regarding her inability to procure housing mirror her arguments regarding her sources of income, addressed above. The court awarded Darcy over four million dollars in assets. That amount is more than sufficient to procure suitable housing, even with the limitations on liquidity of the assets. Because the District Court provided Darcy with the means to procure housing, it did not abuse its discretion in declining to award Darcy the marital home.

¶29 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by the clear application of applicable standards of review. The District Court did not abuse its discretion in dividing the marital estate or in declining to award maintenance. The Decree of Dissolution is affirmed.

/S/ BETH BAKER

We concur:

/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE

14